UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

K & O FOOD MART, ORLANDO OVALLES, )
and DIGNA N. ALMONTE,                 )
                                        )
       Plaintiffs,                )
                                          )
         v.                  )   Case No. 3:18-cv-30026-KAR
                                          )
UNITED STATES DEPARTMENT OF     )
AGRICULTURE,                  )
                                          )
       Defendant.              )


MEMORANDUM AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
(Docket No. 36)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

This matter is before the court on the unopposed motion for summary judgment of the

United States Department of Agriculture ("the government" or "USDA") (Dkt. No. 36). The

Plaintiffs, K & O Food Mart ("K & O"), Orlando Ovalles, and Digna N. Almonte (collectively

"Plaintiffs"), commenced this action, pursuant to 7 U.S.C. § 2023(a)(13), seeking judicial review

of the USDA's Food and Nutrition Service's ("FNS") decision to permanently disqualify them

from participating in the Supplemental Nutrition Program ("SNAP") because they likely

trafficked in SNAP benefits. The parties have consented to this court's jurisdiction (Dkt. No.

18). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons that follow, the court grants the

USDA's motion for summary judgment.

II.     BACKGROUND

A.     The Store

1

Mr. Ovalles and Ms. Almonte owned K & O, a 1,250 square foot convenience store in the Indian Orchard neighborhood of Springfield, Massachusetts (Administrative Record "A.R." at 52, 162). Plaintiffs sold general staple items, tobacco products, alcohol, lottery tickets, "some" fresh meat, deli meats, cheese, and "limited" fresh produce (A.R. at 55, 164, 165, 204). The store had three shopping baskets available for customers' use, but did not have shopping carts (A.R. at 52). A large slide-top floor freezer stood in front of the one small (about 12" x 15"), cluttered checkout counter (A.R. at 37, 53, 69, 164, 204, 206).

The FNS authorized Plaintiffs' participation in SNAP on September 19, 2012 (A.R. at 241). The store had one SNAP point-of-sale device (A.R. at 53).

B.     SNAP

"Congress established SNAP 'to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households.'" *Irobe v. U.S. Dep't of Agric.,* 890 F.3d 371, 375 (1st Cir. 2018) (quoting 7 U.S.C. § 2011). *See* 7 C.F.R. § 271.1. Approved retail food stores may accept SNAP benefits as payment for eligible food items. *See* 7 U.S.C. §§ 2012(k), 2013(a).

 Households meeting the requirements to obtain SNAP benefits use electronic benefit transfer ("EBT") cards, which are similar to debit cards, to purchase eligible food items at authorized stores. *See* 7 U.S.C. §§ 2012(i), 2014, 2016. "In a typical SNAP transaction, a cashier rings up the total food purchases, a household member pays using her EBT card through a point-of-sale device, and the funds in the household's SNAP account are electronically transferred to the store's bank account." *Irobe,* 890 F.3d at 375.

"[A]ny food or food product for home consumption except alcoholic beverages, tobacco, and hot foods or hot food products ready for immediate consumption" are eligible to be

purchased with SNAP benefits. 7 U.S.C. § 2012(k); 7 C.F.R. § 271.2. Qualified households are not permitted to use their EBT cards to obtain cash. *See id.*

A store that exchanges SNAP benefits for noneligible items, including cash, engages in unlawful trafficking. *See J & L Liquor, Inc. v. United States*, Case No. 16-10717, 2017 WL 4310109, at *1 n.1 (E.D. Mich. Sept. 28, 2017) ("Trafficking is the term for a number of fraudulent schemes including buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via . . . EBT cards for cash or consideration other than eligible food.") (citing 7 C.F.R. § 271.2). "For instance, a store trafficks when it 'accept[s] food stamps for sales that never took place,' allowing its customers to receive 'cash rather than merchandise.'" *Irobe,* 890 F.3d at 375 (alteration in original) (quoting *Idias v. United States*, 359 F.3d 695, 698-99 (4th Cir. 2004)).

The FNS administers and polices SNAP. *See Hamdi Halal Mkt., LLC v. United States,* 947 F. Supp. 2d 159, 161-62 (D. Mass. 2013).

> The [FNS] tracks each SNAP household's use of its SNAP benefits through the EBT point of sale system found in each SNAP retailer's location. Each time a SNAP participant uses his EBT card as payment, the EBT point of sale system collects and sends data to the [FNS]. The [FNS] aggregates the data and analyzes it though the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions ("ALERT") system. The ALERT system is designed to detect suspicious SNAP benefit usage indicative of fraud or SNAP benefit trafficking.

*Famous Int'l Mkt. v. United States*, CIVIL ACTION NO. 17-4897, 2018 WL 3015249, at *1 (E.D. Pa. June 15, 2018).

> If the FNS detects a statistically unusual pattern of SNAP transactions at a SNAP-authorized store, it typically refers the matter to a program specialist who arranges for a contractor to visit the store and conduct an on-site investigation. After completing her review of the relevant EBT data and whatever reports emerge from the on-site investigation, the program specialist makes a recommendation to the FNS section chief. If this recommendation is for further action, the section chief sends a charge letter detailing the allegations to the store and affords the store an opportunity to respond. Thereafter, the FNS issues its determination.

*Irobe*, 890 F.3d at 375–76 (citing 7 C.F.R. § 278.6(b), (c)). "If . . . the FNS determines that a store has engaged in trafficking, the store is permitted to pursue an appeal to an administrative review officer ('ARO')." *Madi v. United States*, Civil Action No. 3:16-cv-30064-KAR, 2018 WL 3130641, at *2 (D. Mass. June 26, 2018) (citing 7 U.S.C. § 2023(a)(3); 7 C.F.R. §§ 279.1(a)(2), 279.5)).

The FNS is required to permanently disqualify a firm from participating in SNAP if it finds that personnel of the firm have trafficked. *See* 7 U.S.C. §§ 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). "In certain circumstances, [however,] the agency may impose civil monetary penalties instead of a ban." *Madi*, 2018 WL 3130641, at *2. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i). The store has the right to appeal the agency's final decision to a federal district court. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

C.     The FNS Investigation and Disqualification of Plaintiffs

In the instant case, after "K & O appeared on the EBT ALERT System as having met patterns consistent with possible EBT trafficking violations," the FNS analyzed K & O's transaction data for six months, from December 2016 to May 2017, compared that data with the EBT data from similar convenience stores, and conducted an on-site visit in June 2017 (A.R. at 162-75). The FNS's analysis revealed two patterns that it deemed to be consistent with trafficking (A.R. at 166-75). Consequently, on July 27, 2017, the Section Chief of the FNS Retailer Operations Division sent Plaintiffs a letter notifying them that they were being charged with trafficking in SNAP benefits (the "charge letter") and inviting their response (A.R. at 176-93). Plaintiffs' attorney's response to the charge letter included eleven register receipts (A.R. at

195-202).  After receiving the store's answer to the charge, on September 13, 2017, the FNS determined that Plaintiffs had engaged in trafficking (A.R. at 211-14).

Plaintiffs filed a timely written request for an administrative review of the FNS's decision to permanently disqualify them from participating in SNAP (A.R. at 215-28).  On March 27, 2018, the ARO affirmed the FNS's determination that the store had engaged in trafficking and its decision to impose a permanent disqualification (A.R. at 240-52).

Plaintiffs filed a complaint in this court challenging the FNS's determination that Plaintiffs had engaged in trafficking (Dkt. No. 1).  *See* 7 U.S.C. § 2023(a)(13).  The administrative record was submitted to the court (Dkt. No. 38).  The USDA has moved for summary judgment (Dkt. No. 36).  Plaintiffs have not filed an opposition.

III.    STANDARDS OF REVIEW

A.    Standards of Review of the FNS's Decisions

1.    Trafficking in SNAP Benefits

The district court must conduct a de novo review of the validity of the FNS's administrative determination that Plaintiffs engaged in trafficking.  *See Irobe,* 890 F.3d at 376; 7 U.S.C. § 2023(15); 7 C.F.R. § 279.7(c).  When a court reviews a store's liability for trafficking, "it must reexamine 'the entire matter' instead of simply determining 'whether the administrative findings are supported by substantial evidence.'"  *Irobe,* 890 F.3d at 376 (quoting *Ibrahim v. United States*, 834 F.2d 52, 53 (2d Cir. 1987)).  Put another way, "[t]he Court must reach its own factual and legal conclusions and is not limited to matters considered in the administrative proceeding."  *Ramirez v. United States,* 514 F. Supp. 759, 763 (D.P.R. 1981).

2.    The Penalty for Trafficking

The standard of review of the penalty imposed for trafficking is different. "A reviewing court may disturb the agency's choice of a sanction only if it finds that choice to be 'arbitrary, capricious, or contrary to law.'" *Irobe,* 890 F.3d at 377 (quoting *Mass. Dep't of Pub. Welfare v. Sec'y of Agric.,* 984 F.2d 514, 520 (1st Cir. 1993)).

B.    <u>Standard of Review of an Unopposed Summary Judgment Motion</u>

Summary judgment is appropriate where the record, construed in the light most favorable to the nonmovant, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See McKenney v. Mangino,* 873 F.3d 75, 80 (1st Cir. 2017). "Material facts are those that 'possess[ ] the capacity to sway the outcome of the litigation under the applicable law[,]' and there is a genuine dispute where an issue 'may reasonably be resolved in favor of either party.'" *Cheema v. United States*, 365 F. Supp. 3d 172, 180 (D. Mass. 2019), *appeal docketed sub nom. Cheema's Supermarket v. USDA,* No. 19-1365 (1st Cir. Apr. 19, 2019) (alterations in original) (quoting *Vineberg v. Bissonnette,* 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation and citation omitted)). "In prospecting for genuine issues of material fact, [the court] resolve[s] all conflicts and draw[s] all reasonable inferences in the nonmovant's favor." *Vineberg*, 548 F.3d at 56.

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). "So long as the movant crosses this modest threshold, the nonmoving party 'must, with respect to each issue on which [it] would bear

the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" *Irobe,* 890 F.3d at 377 (alteration in original) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern,* 605 F.3d 1, 5 (1st Cir. 2010)). "Put another way, summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify 'significantly probative' evidence favoring his position." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)).

"An unopposed motion for summary judgment is not automatically granted." *Trzepacz v. United States,* CIVIL ACTION NO. 14-10657-GAO, 2017 WL 470889, at *1 (D. Mass. Feb. 3, 2017). "[T]he court still must determine, on the record before it, whether [the d]efendant is entitled to summary judgment." *Gedeon v. N. Constr. Servs., LLC*, Civil Action No. 15-cv-30038-KAR, 2016 WL 6832620, at *2–3 (D. Mass. Nov. 18, 2016). *See Cordi–Allen v. Halloran*, 470 F.3d 25, 28 (1st Cir. 2006) (citing Fed. R. Civ. P. 56(e) (instructing that if the adverse party fails to respond, "summary judgment, if appropriate, shall be entered"); *Stonkus v City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003)). "[E]ven an unopposed motion for summary judgment should not be granted unless the record discloses that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Rivera–Torres v. Rey–Hernández*, 502 F.3d 7, 13 (1st Cir. 2007) (citing *Vélez v. Awning Windows, Inc.*, 375 F.3d 35, 42 (1st Cir. 2004); *Mendez v. Banco Popular de P.R.*, 900 F.2d 4, 7 (1st Cir. 1990)). "In most cases, however, 'a party's failure to oppose summary judgment is fatal to its case.'" *Ferreira v. Mortg. Elec. Registration Sys., Inc.*, 794 F. Supp. 2d 297, 301 (D. Mass. 2011) (quoting *Pérez–Cordero v. Wal–Mart P.R.*, 440 F.3d 531, 533–34 (1st Cir. 2006)).

IV.   ANALYSIS

A.   The FNS's Determination that Plaintiffs Engaged in Unlawful Trafficking in SNAP Benefits was Valid.

"The resolution of . . . a [summary judgment] motion may depend on which party bears the burden of proof on a particular issue." *Irobe,* 890 F.3d at 377-78 (citing *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados,* 279 F.3d 49, 55 (1st Cir. 2002); *Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 35-36 (1st Cir. 1998)). In the First Circuit, the store bears the burden of demonstrating by a preponderance of the evidence that it did not engage in trafficking and the FNS's action was invalid. *Id.* at 378.

The summary judgment analysis begins with the evidence the FNS presented in support of its motion. *See Celotex Corp.,* 477 U.S. at 323. The FNS permissibly relied on an analysis of six months of transaction data from the EBT database and a contractor's on-site visit to K & O when it determined that Plaintiffs engaged in trafficking. *See* 7 U.S.C. § 2021(a)(2) (the disqualification of a retail store can be based on "evidence that may include facts established through on-site investigations, inconsistent redemption data, [and] evidence obtained through a transaction report under an electronic benefit transfer [EBT] system."); *Idias,* 359 F.3d at 698 (the government may permanently disqualify a retailer based on EBT data); *see also* 7 C.F.R. § 278.6(a) (same).

The court "give[s] no weight to the agency's finding that trafficking occurred." *Irobe,* 890 F.3d at 379. To carry its summary judgment burden, however, "[t]he [FNS] need not adduce evidence it caught [Plaintiffs] 'red-handed' engaging in SNAP benefit trafficking." *Famous Int'l Mkt.,* 2018 WL 3015249, at *10. Instead, the court, like the FNS, can "rely on circumstantial evidence created by EBT data" when determining whether or not to grant summary judgment. *Cheema,* 365 F. Supp. 3d at 181. Consistent with the treatment of circumstantial evidence in other contexts, the court is permitted to draw reasonable inferences from the evidence. *See*

*Irobe,* 890 F.3d at 379 (the court considered circumstantial evidence, and reasonable inferences drawn from the evidence, in allowing the government's summary judgment motion).

In an unopposed summary judgment motion, the court then considers the administrative record to determine whether the evidence Plaintiff proffered to the FNS sustained their burden of presenting "'significant probative'" evidence demonstrating that the irregular EBT transaction data was not due to trafficking. *Irobe,* 890 F.3d at 377 (quoting *Anderson,* 477 U.S. at 249-50). *See Aguiar-Carrasquillo v. Agosto-Alicea,* 445 F.3d 19, 25 (1st Cir. 2006) (in an unopposed summary judgment motion, the court is "'obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate.'") (quoting *Mullen v. St. Paul Fire & Marine Ins. Co.,* 972 F.2d 446, 452 (1st Cir. 1992)). "[C]onclusory generalizations" are insufficient to survive a summary judgment motion. *Irobe,* 890 F.3d at 380 n.3. *See Famous Int'l Mkt.,* 2018 WL 3015249, at *10.

In the instant case, after analyzing the EBT database transactions that Plaintiffs processed from December 2016 to May 2017 and conducting an on-site visit to K & O, the FNS identified two transaction patterns indicative of trafficking in SNAP benefits. Specifically, the FNS alleged that K & O processed: (1) multiple transactions made from the same individual household EBT accounts within unusually short periods of time; and (2) "[e]xcessively large purchase transactions" when compared to convenience stores of similar sizes (A.R. at 240). Although the First Circuit has not required a store to rebut every alleged unlawful transaction, *Irobe,* 890 F.3d at 380 n.3 (citing *Ganesh v. United States,* 658 F. App'x 217, 219 (6th Cir. 2016)), viewed in light of the summary judgment standard and the circumstantial evidence of trafficking, the evidence Plaintiffs presented to FNS falls short of demonstrating a triable factual issue and the USDA is entitled to summary judgment.

1.      **Repetitive transactions made from the same household EBT accounts within an unusually short time support a finding of SNAP benefit trafficking.**

Multiple, rapid transactions by the same SNAP-eligible household is a well-recognized indicator of SNAP benefit trafficking. The FNS posits that "[v]iolating stores often conduct multiple transactions from the same household account in short periods of time to avoid the detection of single high-dollar transactions that cannot be supported by the retailer's inventory, store type and structure" (A.R. at 247).

In the instant case, the FNS identified seventy-one EBT transactions where a single household account made multiple withdrawals involving relatively high dollar amounts within a short time (A.R. at 179-82, 246-48). The seventy-one transactions consisted of thirty-three sets of transactions made by the same household within approximately twenty-four hours, totaling $4,573.48 in SNAP benefits (A.R. at 182). Of the seventy-one transactions in the thirty-three sets, the FNS calculated the average amount per transaction to be $64.41 and the average transaction amount per set to be $139.59 (A.R. at 246-47).

The timing and size of the identified transactions permits the reasonable inference that Plaintiffs exchanged SNAP benefits for cash. For example, two SNAP-eligible households each swiped their EBT cards twice within about one minute (A.R. at 179). In addition to the rapid succession of those transactions, given that the store's highest price SNAP-eligible item was a twenty-pound bag of rice that cost $14.99, the amounts of the transactions – one household's transactions totaled $126.98 and the other's totaled $138.48 – indicated trafficking (A.R. at 179, 246). *See Irobe,* 890 F.3d at 379 ("the factfinder may reasonably infer trafficking when the redemption data shows that a small store with a selective inventory and limited staffing regularly processes purported high-dollar SNAP transactions in rapid succession."); *Nadia Int'l Mkt. v.*

*United States*, Case No. 5:14-cv-82, 2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015), *aff'd,* 689 F.

App'x 30 (2d Cir. 2017) ("The fifty-four transactions reflecting multiple highly priced purchases

with high dollar transaction amounts by the same household in timeframes ranging from fifty

seconds to twenty-two hours and fifty-one minutes are also indicative of trafficking because

Plaintiff did not have a wide variety of highly priced food items available.  It is thus unlikely

that, without shopping carts and with only a few handheld baskets, a household could carry the

items necessary to reach these high dollar amounts.").

Plaintiffs pressed several grounds to dispute the FNS's allegation that rapid purchases by

the same household evinced trafficking in SNAP benefits.  Specifically, Plaintiffs argued that:

Mr. Ovalles and Ms. Almonte, the store's only employees, received SNAP training and did not

traffic in SNAP benefits; the "numbers [did] not appear to be unusual or excessive" for a 180 day

period; customers' purchases were tallied in multiple transactions because the checkout counter

was small; customers came to the store several times each day because the neighborhood was far

from major shopping areas and they carried their purchases from the store; and the eleven

register receipts that they offered demonstrated that the thirty-three sets of transactions were

legitimate (A.R. at 195-97, 216-18, 224-27).[1]  However, Plaintiffs failed to present substantial

evidence refuting the FNS's assertion that the abnormal EBT transaction patterns constituted

circumstantial evidence of trafficking.

Plaintiffs' general denial of the trafficking charge and unsupported claim that the EBT

transaction data cited by the USDA was "normal" are easily dismissed as conclusory.  "The

store's factually unsupported arguments do not create a genuine dispute about the legitimacy of

---

[1] Although Plaintiffs submitted copies of fourteen receipts, the receipts for $94.62, $60.34, and
$53.26 were duplicates (A.R. at 225-26).

the irregular EBT transactions." *Rodriguez Grocery & Deli v. U.S., Dep't of Agric. Food & Nutrition Serv.*, Civil No. WDQ-10-1794, 2011 WL 1838290, at *4 (D. Md. May 12, 2011). *See Irobe,* 890 F.3d 380 n.3.

Plaintiffs contended that the size of the store explained the transaction pattern. According to Plaintiffs, SNAP customers made several purchases in rapid succession because the counter was small and only a few items could be processed during a single transaction (A.R. at 217). However, without shopping carts, a large counter space, "an optical scanner to scan products into the cash register system . . . and with only one cash register [and one point-of-sale device], it is highly unlikely [Plaintiffs] would be able to process not only transactions in quick succession but transactions in quick succession of high dollar amounts" (A.R. at 52, 53, 164, 204, 246).[2] *Famous Int'l Mkt.,* 2018 WL 3015249, at *13 & n.161 (citing *Nadia Int'l Mkt.,* 2015 WL 7854290, at *7.

Plaintiffs next claimed that the store's location "away from any major shopping area" explained why customers made several trips to the store within short periods of time (A.R. at 195). However, the FNS's information indicated that there were three supermarkets within a two-mile radius of K & O that offered "a wider variety, quantity and better prices for EBT customers" (A.R. at 169). "[A]t least 10 comparable or larger SNAP-authorized stores . . .

---

[2] The record contains inconsistent information regarding the presence of an optical scanner at the checkout counter. The report of the store visit by an FNS "contractor" on June 17, 2017 indicated that the store did not have an optical scanner (A.R. at 52, 54). Although the July 19, 2017 Case Analysis indicates that an optical scanner was used at checkout, the final agency decision of March 27, 2018 states that, based on the store visit, "the store does not appear to use optical scanners to process transactions" (A.R. at 164, 246). Plaintiffs did not mention the presence of optical scanners in their arguments to the FNS (A.R. at 195-201, 216-27). In any event, in view of the strong evidence of trafficking, the use of optical scanners would not change the court's decision.

including a supermarket" were located within one mile (A.R. at 251). The FNS's EBT

transaction records showed that the "vast majority" of SNAP eligible households who shopped at

K & O also regularly shopped at the area supermarkets that had shopping carts (A.R. at 247).

Therefore, there appeared to be little reason for a household to spend hundreds of dollars in a

repetitive fashion at a small convenience store rather than shopping at a much larger nearby store

(A.R. at 247).

Further, Plaintiffs failed to present evidence that their customers returned within short

periods of time because they carried the items that they purchased. Instead, their assertion was

based on impermissible conjecture (A.R. at 217 ["Perhaps the shoppers are carrying the food

home and break up the purchases."]). *See Famous Int'l Mkt.,* 2018 WL 3015249, at *13. "When

the moving party has carried its burden under Rule 56(c), its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (footnote omitted).

Finally, even when viewed in the light most favorable to the Plaintiffs, the copies of the

eleven register receipts they proffered were not sufficient to refute the inference that the seventy-

one identified transactions (thirty-three sets) evinced trafficking.[3] In fact, some receipts

supported the government's position. The FNS identified two transactions that occurred within

seven hours of each other on February 4, 2017 as being consistent with trafficking (A.R. at 180).

The first transaction was in the amount of $128.23 and the second was in the amount of $105.86

_____

[3] Seven of the submitted receipts corresponded to transactions that the FNS identified as being
suspicious repetitive withdrawals from the same household accounts within short spans of time.
*Compare* A.R. at 199-201 *with* A.R. at 179-82.

(A.R. at 180). Plaintiffs submitted a register receipt for the second transaction showing one "grocery non-taxable" item for $39.88, another "grocery non-taxable" item for $29.88, one "bakery" item for $4.25, one "deli" item for $22.86, one "deli" item for $3.99, and a sandwich for $5.00 (A.R. at 199, 224). In contrast to the generic descriptions of the items allegedly purchased during the second transaction on February 4, 2017, the submitted register receipts for the transactions that occurred on February 8, 2017, when thirty items were purchased, and on another occasion, when forty-three items were purchased, specifically described the grocery items purchased (A.R. at 200, 225). For example, the itemized receipts listed "Kraft Cheez Whiz," "Guida's 100% orange juice," "Peggy Lawton cookies," and "Nabisco Oreos" (A.R. at 200, 225). Those few apparently legitimate receipts are insufficient to refute the strong evidence of trafficking demonstrated by the thirty-three sets of questionable transactions identified by FNS. *See Irobe,* 890 F.3d at 381 ("Merchants may conduct legitimate business side-by-side with unlawful trafficking.").

The evidence from the FNS's EBT transaction database showing thirty-three sets of transactions made from the same household accounts in rapid succession creates a strong inference that Plaintiffs were trafficking in SNAP benefits. *See Ganesh*, 658 F. App'x at 221 & n.1 (affirming the government's finding of trafficking where "the FNS documented 118 sets of [transactions] by 29 households, including times in which the same household had two transactions of over fifty dollars each within two to three minutes of each other."); *Cheema,* 365 F. Supp. 3d at 186 ("The existence of a large number of multiple transactions made from the same EBT account in a short time frame is . . . evidence of trafficking."). In light of the strength of the government's evidence, Plaintiff's rebuttal evidence was not sufficiently substantial to establish a genuine issue of material fact. *See Irobe,* 890 F.3d at 380 ("Where the plaintiff has

the burden of proof, 'there must be evidence on which the [factfinder] could reasonably find for the plaintiff.'") (alteration in original) (quoting *Anderson,* 477 U.S. at 252).

## 2. High-dollar transactions support a finding of SNAP benefit trafficking.

The government identified 499 suspicious high-dollar EBT transactions that occurred between December 2016 and May 2017.  According to the FNS, the average totals of the 499 transactions and the unusual amounts of some of those transactions provided additional evidence that Plaintiffs trafficked in SNAP benefits (A.R. at 183-91, 248-49).  Plaintiffs countered that the majority of the 499 transaction amounts were not unusual or excessive particularly because the store was popular in the neighborhood and its customers bought high-priced meat, fish, baked goods, and infant formula (A.R. at 195-97, 216-18).

The FNS's position -- that the large number of high-dollar EBT transactions proved trafficking -- was supported by its comparison of Plaintiffs' EBT transaction history from December 2016 to May 2017 with the EBT transactions of convenience stores in Massachusetts and in Hampden County, where K & O was located, for the same time period (A.R. at 248).  *See Cheema,* 365 F. Supp. 3d at 187 (to prove trafficking in SNAP benefits based on high-dollar transactions, the FNS compared the suspect store's transaction history with that of other similar stores); *109 Merrick Deli Corp. v. United States,* No. 11-CV-977 (SLT)(RER), 2014 WL 6891944, at *4 (E.D.N.Y. Sept. 30, 2014) (same).  The EBT database revealed that the 499 suspicious SNAP transactions ranged in amounts from $158.62 to $29.87 for a total $28,897.25 (A.R. at 183-91, 248).  There were seven transactions for $120.00 or more, twenty-five transactions for amounts between $100.00 and $119.99, and twenty-six transactions for amounts between $90.00 and $99.99 (A.R. at 248).  Of the 499 suspect transactions, the average

transaction amount was $57.91 (A.R. at 183-91, 248).  During the same six-month period, the average total SNAP transactions for convenience stores in Massachusetts was $7.78 and the average for Hampden County was $7.60 (A.R. at 167, 169, 248).  When compared to the state and county averages, the average of Plaintiffs' 499 suspect SNAP transactions was more than seven times higher (A.R. at 248).  The significant variance between the average amounts of Plaintiffs' suspicious EBT transactions and the average amounts of comparable convenience stores' EBT transactions is strong evidence that Plaintiffs trafficked in SNAP benefits.  *See Irobe,* 890 F.3d at 379 ("the factfinder may reasonably infer trafficking when the redemption data shows that a store regularly processes purported SNAP transactions for significantly higher per-transaction amounts than nearby stores offering similar wares."); *Nadia Int'l Mkt.,* 2015 WL 7854290, at *7 ("Plaintiff's average monthly EBT transactions from August to October of 2012 were significantly higher than comparable stores located nearby and thus also indicative of trafficking EBT benefits.").

The FNS also pointed to the number of "highly unusual transactions with similar amounts" as evidence of trafficking (A.R. at 248).  *See SS Grocery, Inc. v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 340 F. Supp. 3d 172, 181 (E.D.N.Y. 2018) ("the Court agrees with FNS' conclusion that the 'disproportional amount of transactions that end in a same cent value' appear 'contrived.'"); *Duchimaza v. United States*, 211 F. Supp. 3d 421, 433 (D. Conn. 2016) ("An unusually large number of same cent value transactions is one of the patterns shown in Government investigations of known trafficking to be associated with trafficking activity.").  In support of its finding of trafficking, the FNS cited the following:  six transactions for either $119.86 or $119.88; nine transactions for amounts between $98.86 and $99.86 that used the same three digits, 6, 8, and 9; four transactions for $79.88, two for $79.89, and two for $79.86;

and five transactions for 60.99, three for 60.98, three for $59.99, and three for $59.88 (A.R. at 248). According to the FNS, the transactions with the pattern of similar amounts evinced trafficking because they were "well outside the normal pattern of SNAP usage," indicative of an attempt to "mask trafficking by avoiding even-dollar amounts," and statistically unlikely to occur as frequently as they did in K & O's transactions (A.R. at 248). To the extent some of those transactions might have been legitimate, combined with the FNS's other evidence, their frequent occurrence supported the finding of trafficking. *See 109 Merrick Deli Corp.,* 2014 WL 6891944, at *4 ("the trafficking finding is based on inferences drawn from the suspicious combination of usual electronic data which [Plaintiff] cannot explain away").

Although Plaintiffs did not attempt to explain the unusual pattern of transactions with similar amounts, they pointed to the fact that out of the 499 transactions, 366 showed amounts between $70.00 and $29.87 (A.R. at 196-97). Even if $70.00 EBT transactions were not considered excessively large for a store with K & O's characteristics, the number of transactions exceeding that amount – 133 – were sufficient to prove trafficking. *See Cheema,* 365 F. Supp. 3d at 188-89 (approximately 100 uncontested alleged SNAP violations were sufficient to warrant a finding of trafficking); *Duchimaza,* 211 F. Supp. 3d at 437 (121 high-dollar EBT transactions indicated trafficking).

In response to FNS's claim that Plaintiffs' SNAP transaction average was seven times higher than the transaction averages of comparable stores, Plaintiffs claimed that K & O was "very popular in the neighborhood" because the owners were Hispanic and the store was in a "heavily populated area" of mostly Hispanic families with "many children" (A.R. at 217). However, Plaintiffs' failure to cite evidence in support of their conclusory assertions dooms their argument. *See Irobe,* 890 F.3d at 381 (a party's "unsupported opinion" is not sufficient to

establish a genuine issue of material fact); *Famous Int'l Mkt.,* 2018 WL 3015249, at *14 ("Even assuming the [plaintiff-market] is well-stocked and offers international foods, the [m]arket does not adduce specific evidence addressing why its EBT transaction data differs so greatly from the comparison stores when the comparison stores carry roughly the same inventory.").  Moreover, Plaintiffs' position is at odds with the physical characteristics of the store, which were described earlier, and the prices of the SNAP-eligible items in its inventory.  *See SS Grocery, Inc.*, 340 F. Supp. 3d at 182 ("Given [the plaintiff store's] size, layout, lack of shopping carts, as well as lack of technology to quickly process large transactions, it is highly implausible that each and every one of the excessively large transactions took place.").  The on-site investigator observed that most of K & O's SNAP-eligible inventory was priced at about $6.99 or less and the store did not offer meat bundles or items sold in family packs, bulk, or pallets (A.R. at 53, 164, 168).  *See Famous Int'l Mkt.,* 2018 WL 3015249, at *14 ("The investigator sent to the [plaintiff market] did not observe meat bundles for sale and the [plaintiff] has not adduced evidence it sold similar meat bundles, which could provide a reasonable explanation for the large transactions.").  In addition, the FNS's data showing that K & O's customers regularly shopped at "larger, better stocked stores in the area," which had shopping carts, further refuted Plaintiffs' claims (A.R. at 247-48).  *See Duchimaza,* 211 F. Supp. 3d at 437 ("the record shows that [plaintiff's] patrons had other nearby options at which they would be more likely to make large purchases.").

Plaintiffs' argument that the large number of high-dollar transactions was due to customers' purchases of baby formula as well as sales from K & O's "extensive" and very popular meat and fish departments and its bakery is similarly unavailing (A.R. at 195-96, 217). With the exception of infant formula, Plaintiffs failed to substantiate their claim of having high-priced inventory items by providing the per unit prices of the SNAP-eligible food that they

claimed supported the high-dollar sales.  Instead, to substantiate their position, Plaintiffs relied on the eleven receipts, which were described earlier as containing mostly generic descriptions (A.R. at 199-201, 224-27).   Although two of the eleven receipts Plaintiffs submitted showed Similac infant formula at $18.49 per unit, K & O was an authorized retail store in the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") (A.R. at 224, 227, 246).  According to the FNS, because SNAP-eligible households are also likely eligible for WIC benefits, and because infant formula can be purchased with WIC benefits, it would make "little sense" for a WIC-eligible household to spend their limited SNAP benefits on infant formula (A.R. at 249).  Plaintiffs did not offer evidence to refute this assertion.  Therefore, it is reasonable to infer that the receipts were contrived to mask trafficking in SNAP benefits. However, even assuming that the transactions on the eleven receipts were valid, eleven transactions out of 499 is not sufficient to create a genuine issue of material fact.  *See Famous Int'l Mkt.,* 2018 WL 3015249, at *14 (thirty-two potentially valid high-dollar transactions out of 400 was insufficient to refute the store's explanation for its large transactions).

The FNS presented significant circumstantial evidence that Plaintiffs trafficked in SNAP benefits by exchanging them for cash.  Plaintiffs' evidence, even when viewed through the favorable summary judgment lens, falls short of the substantial evidence necessary to rebut the USDA's strong case of trafficking.  Accordingly, the USDA is entitled to summary judgment. *See Dollar Plus Food Mart LLC v. United States*, No. CV-13-01934-PHX-DLR, 2015 WL 11090898, at *5 (D. Ariz. May 8, 2015) ("if the store owner fails to meet [its] burden . . . to demonstrate a material dispute of fact as to the existence of a SNAP program violation, summary judgment may granted in favor of the government") (citing *Kim v. United States,* 121 F.3d 1269, 1271 (9th Cir. 1997)).

B. The FNS's Permanent Disqualification of Plaintiffs was not Arbitrary, Capricious, or Contrary to the Law.

As noted earlier, the FNS's decision to disqualify Plaintiff will stand if it is not arbitrary, capricious, or unwarranted in law. *See Irobe,* 890 F.3d at 377. Notwithstanding Plaintiffs' request for a civil monetary penalty in lieu of permanent disqualification from participation in SNAP, they failed to comply with the regulations that permit the imposition of a civil penalty.

A store that commits trafficking violations "shall" be permanently disqualified from SNAP participation. 7 U.S.C. § 2021(b)(3)(B). *See* 7 C.F.R. § 278.6(e)(1)(i) ("The FNS regional office shall . . . [d]isqualify a firm permanently if . . . personnel of the firm have trafficked as defined in § 271.2 . . . ."). However, "[t]he SNAP regulations permit a [firm] that has committed trafficking violations to request the sanction of a civil money penalty in lieu of permanent disqualification." *Li Xia Lu v. United States*, CIVIL ACTION No. 18-cv-1969, 2019 WL 2371759, at *7 (E.D. Pa. June 4, 2019) (citing 7 C.F.R. § 278.6(b)(2)(i)). "The request and evidence must be submitted within ten days of receiving the charge letter." *Id.* (citing 7 C.F.R. § 278.6(b)(2)(ii)–(iii)). In order to qualify for a civil monetary penalty, the firm must submit "'substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent [SNAP] violations . . . ,' by establishing the fulfillment of four criteria enumerated in the SNAP regulations." *Id.* (quoting 7 C.F.R. § 278.6(i)).[4] Although Plaintiffs requested a civil monetary penalty within ten days of receiving

---

[4] In order to be eligible for a civil monetary penalty instead of permanent disqualification, a store must establish all of the following criteria by substantial evidence:

Criterion 1: The firm shall have developed an effective compliance policy as specified in [7 C.F.R.] § 278.6(i)(1); and

the charge letter, they failed to submit the evidence required by the regulations (A.R. at 195-201).

Plaintiffs' claims that disqualification will cause hardship for the neighborhood and the store are similarly unavailing (A.R. at 220). First, the regulations do not provide an exception to permanent disqualification based on economic hardship. Further, a civil penalty is appropriate when "the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to SNAP households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices." 7 C.F.R. § 278.6(f)(1). Given that the three supermarkets within two miles of K & O offered a larger variety of SNAP-eligible food at better prices, Plaintiffs failed to meet the regulation's criteria (A.R. at 169, 251). *See Hamdi Halal Mkt.,* 947 F. Supp. 2d at 166.

Because the law requires permanent disqualification in the circumstances presented by this case, there is no basis to disturb the penalty imposed by the USDA.

V.    CONCLUSION

---

Criterion 2: The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of the violations cited in the charge letter sent to the firm; and

Criterion 3: The firm had developed and instituted an effective personnel training program as specified in [7 C.F.R.] § 278.6(i)(2); and

Criterion 4: Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct of approval of trafficking violations . . . .

7 C.F.R. § 278.6(i).

For the above-stated reasons, the USDA's motion for summary judgment (Dkt. No. 36) is allowed. The clerk's office is directed to close the case.

It is so ordered.

Dated:  July 3, 2019                                         /s/ Katherine A. Robertson
                                                             KATHERINE A. ROBERTSON
                                                             U.S. MAGISTRATE JUDGE